UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HARRY G. PAGOULATOS, GEORGE G.
REZITIS, and ANGELOS TRIANTAFILLOU,

　　　　　　Plaintiffs,

　　vs.　　　　　　　　　　　　　　　　　Case No. TBA

BRIGHT MOUNTAIN MEDIA, INC., AND
W. KIP SPEYER,

　　　　　　Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Harry G. Pagoulatos (hereinafter referred to as "Plaintiff(s)" or "Pagoulatos"), George G. Rezitis (hereinafter referred to as "Plaintiff(s)" or "Rezitis"), and Angelos Triantafillou (hereinafter referred to as "Plaintiff(s)" or "Triantafillou"), (hereinafter referred to collectively as the "Plaintiffs") by counsel, for its Complaint against Bright Mountain Media, Inc. (hereinafter referred to as "Bright Mountain" and/or Defendant(s), and W. Kip Speyer (hereinafter referred to as "Speyer" and/or "Defendant(s)" (hereinafter referred to collectively as the "Defendants"), state as follows:

## PARTIES

1. Plaintiff Harry G. Pagoulatos is an individual residing at 20 Rena Lane, Bloomfield, New Jersey 07003.

2. Plaintiff George G. Rezitis is an individual residing at 90 West First Street, Clifton, New Jersey 07011.

3. Plaintiff Angelos Triantafillou is an individual residing at 102 Mountainside Terrace,

Clifton, New Jersey 07013.

4. Defendant Bright Mountain Media, Inc. is a corporation with its principal place of business at 6400 Congress Avenue, Boca Raton, Florida 33487.

5. Defendant Kip Speyer is a citizen of the State of Florida. Speyer is the Chairman and CEO of Bright Mountain Media, Inc.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action under 12 U.S.C. §1332, because there is complete diversity of citizenship between the plaintiffs and the defendants, and the matter in controversy exceeds the sum or value of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

7. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §1391(a), because the Defendants are located in this judicial district.

8. Daily Engage Media Group, LLC (hereinafter referred to as "Daily Media") is the company whose interests have allegedly been conveyed to the Defendants, has and continues to operate from within the State of New Jersey from inception to date. The primary independent contractor used by Plaintiffs has been Vinay Belani (hereinafter referred to as "Belani") who has been together with the Plaintiffs since November of 2015 and continues to date. All business regarding Daily Media the entity over which the Plaintiffs control does business solely in the State of New Jersey from the homes of both Pagoulatos and Rezitis. No office outside of the State of New Jersey exists nor has there ever been an office for Daily Media. All business is conducted from within the State of New Jersey to both India and other national locations but commences and terminates in the State of New

Jersey.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

9.  Plaintiffs started an internet advertising company in or about February of 2015 by virtue of the formation of Daily Engage Media Group, LLC which said Limited Liability Company was formed in the State of New Jersey by Pagoulatos.

10. Plaintiffs invested time, money and services into Daily Media. Triantafillou was an investor and invested money into the operations of Daily Media.

11. Daily Media was formed for the purpose of doing business for Pagoulatos and Rezitis in which Triantafillou invested money. This entity was formed in or about February of 2015. Pagoulatos had been in the software I.T. business for several years prior to learning the business and operating Daily Media. Rezitis had been in the I.T. business for twenty (20) years prior to learning the business and operating Daily Media.

12. Daily Media, through the efforts of both Pagoulatos and Rezitis, accumulated almost all of the publishers (clients) which it had specific contracts. Daily Media had been doing business using whatever business information it had which was then created by both Pagoulatos and Rezitis. Daily Media is an entity known as an ad network. An ad network like Daily Media typically has contracts with publishers and ad exchanges. An example of an ad exchange would be AOL and an example of a publisher would be CNN. CNN (by example) maintains a website that has advertising within it. Daily Media would also have a contract with AOL. All of these contracts and relationships existed through the efforts of Pagoulatos and Rezitis solely and exclusively.

13. An advertiser, for example, BMW, may choose to advertise on the internet. It would then contact an ad exchange similar to AOL indicating its desire to advertise and, for purposes here, indicating a budget of Ten Thousand ($10,000.00) Dollars. AOL would be aware that Daily Media had contracts with it and, for our purposes, assume that AOL's contract price would be that of eighteen (18%) percent. AOL and CNN would also know that CNN had contracts with Daily Media and that CNN would receive eighty (80%) percent and Pagoulatos would receive twenty (20%) percent. In the above example, AOL would receive One Thousand Eight Hundred ($1,800.00) Dollars and pay the sum of Eight Thousand Two Hundred ($8,200.00) to Daily Media. The CNN contract would indicate that CNN would be entitled to Six Thousand Five Hundred and Sixty ($6,560.00) Dollars of the Eight Thousand Two Hundred ($8,200.00) and that One Thousand Six Hundred and Forty ($1,640.00) Dollars would be kept by Daily Media.

14. A "cash flow problem" existed and has existed to date in that if the transaction took place in January, the Six Thousand Five Hundred and Sixty ($6,560.00) Dollars would be due somewhere around the end of February/beginning of March while the money due Daily Media from AOL would not be paid until the end of March/beginning of April as AOL would pay net-60 but CNN would be entitled to its money net-30. Daily Media always needed and continues to need today working capital sufficient to fund the aforesaid deficiencies created by the different payment dates such that additional customers would require additional working capital which Daily Media did not have. In summary, Daily Media was required to advance, as in the example Six Thousand Five Hundred and Sixty ($6,560.00) Dollars in order to net One Thousand Six Hundred and Forty ($1,640.00) Dollars. The due dates of payments prior to receipts caused the "cash flow problem".

15. Daily Media has numerous competitors in the marketplace and competes by efficiency and ad placement based upon price with the use of various platforms of which it currently uses RTB, a company by the name of Xendiz OU, situate in the Ukraine. There exists about thirty (30) other companies similar thereto. From inception, Daily Media has also used the services of Belani who, along with various other employees in India working with Belani, provide additional software support so as to conduct the aforesaid business. None of these companies are unique other than they had relationships prior to the knowledge of the Defendants.

16. Sometime in 2016 Daily Media attempted to solicit Kip Speyer's (hereinafter referred to as "Speyer") website as a publisher and subsequently Plaintiffs were promised "working capital" after being wined and dined by Speyer.

17. This contact resulted in Speyer indicating a desire to assist Plaintiffs in growing Daily Media. Plaintiffs were in great need of additional working capital or some kind of credit line to address the aforesaid "cash flow problem". Rezitis and Pagoulatos had exceptional expertise in acquiring new clients based upon their own interpersonal skills; however, to acquire a new client meant that they needed additional money to advance before obtaining their money (cash flow problem).

18. Speyer offered to alleviate the "cash flow problems" and to compensate the Plaintiffs for acquiring their business such that the promise was made to provide immediate return on investment to plaintiffs in the sum of One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars in cash with the remainder to be paid in stock which would be the consequence of a public offering based upon various terms and conditions. The total consideration was One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars

cash at closing and Two Million Nine Hundred and Fifty Thousand ($2,950,000.00) Dollar stock value for a total of Four Million Nine Hundred and Fifty Thousand ($4,950,000.00) Dollars. Plaintiffs understood and agreed that the money up front would satisfy their personal needs having built up Daily Media and that the influx of capital by the Defendants would assure growth and that they would further share in the growth by virtue of increasing the value of their stock in a new entity yet to be formed. These representations by Speyer are the very quintessence for the within lawsuit as these were the representations relied upon by the Plaintiffs to in effect turn the financial reigns over to their business to Speyer and continue working for the business but now with new working capital and increased personal wealth by virtue of the upfront money.

19. In or about February of 2017, a certain Letter of Intent was provided to Plaintiffs reflecting the payment to Plaintiffs of the sum of Four Million Nine Hundred and Fifty Thousand ($4,950,000.00) Dollars in exchange for the certain rights of the company and that Plaintiffs would receive approximately One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars in cash as well as stock and certain incentives as more fully set forth in the First Agreement of Sale, a copy of which is attached hereto and made a part hereof as **Exhibit A**. Plaintiffs were to benefit from One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars in cash, the issuance of stock, and the assurance that the entity in which they had dedicated their lives would increase its gross sales by virtue of increasing working capital so that the "cash flow problem" would be eliminated.

20. In reliance upon the foregoing, the Plaintiffs were forced to borrow large and divers sums of money as Speyer had insisted that they obtain new customers despite the "cash flow problem" and that a target closing date of April 15, 2017 would more than suffice to

alleviate any problems with respect to their increased debt. Plaintiffs, in expectation of the representations of Speyer that they would be receiving One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars in cash, continued prior to closing to building up Daily Media with their own personal funds incurring various hard money loans all in anticipation of the target closing date of April 15, 2017.

21. Speyer requested that Plaintiffs advance further monies so as to advance their technology in completing the purchase of a certain software platform which links ad networks together commonly referred to as the "RTB platform." The Plaintiffs had advanced in excess of Seventy-Five Thousand ($75,000.00) Dollars to set up this platform for which they were promised reimbursement.

22. Plaintiffs were never reimbursed by Defendants.

23. It was always the understanding of Plaintiffs and the representation by Defendant Speyer that Speyer would provide the working capital, either from his own company, himself, or through his own investors. Pagoulatos, in reliance of the aforesaid representations, increased monthly grosses from approximately One Hundred and Fifty Thousand ($150,000.00) Dollars to Three Hundred and Thirty Thousand ($330,000.00) Dollars especially in February and March of 2017.

24. Because for the aforesaid "cash flow problem", the potential profits increased substantially; however, the cash flow deficiency increased consistent therewith and forced Plaintiffs to borrow additional money from third-party sources, with large and divers interest rates. It is estimated that the Plaintiffs incurred approximately Ninety-Five Thousand ($95,000.00) Dollars in interest as a result thereof.

25. Although Defendants satisfied some of the loans in or about July of 2017, additional

monies were still owed and the company has constantly been underfunded as set forth in **Exhibit B,** attached hereto and made a part hereof, which reflects monthly deficiencies of the Defendants being approximately one-half (1/2) of the projections.

26. Despite the numerous promises and representations, the closing set forth for April 15, 2017 did not take place, the Agreement is never executed, and more importantly the consideration consistent therewith was never paid, i.e. the One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars in cash and the stock worth approximately Two Million Nine Hundred and Fifty Thousand ($2,950,000.00) Dollars. Prior to the payment of certain Daily Media loans and before setting up a new closing date, Speyer with full knowledge that the Plaintiffs were unable to meet their current financial deficits as a result of increasing sales, purchasing a RTB platform, and the like. Speyer had promised future growth with de minimus cash up front in a new Agreement, a copy of which is attached hereto and made a part hereof as **Exhibit C**. The new Agreement reduces the cash up front of Four Hundred Thousand ($400,000.00) Dollars and later Three Hundred and Eighty Thousand ($380,000.00) Dollars in lieu of the original One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars. The salaries are reduced for the first four (4) months to further accommodate Speyer based upon his additional promises. The up-front money of Three Hundred and Eighty Thousand ($380,000.00) Dollars was also changed between the representation made and the Agreement presented at closing to be that of a Promissory Note payable on September 19, 2018, a year after the Agreement's execution. Speyer later told Pagoulatos that the Defendants would not honor the cash payment in September of 2018.

27. It is important to note that at the time of the execution of the Agreement, Plaintiffs had no

legal representation whatsoever.

28. In addition, Speyer had previously warranted and represented that a "big chunk" of the promised money would in fact be paid in December of 2017. This was further aggravated by the lack of fulfillment of promises by Speyer for not properly funding the company nor compensating the Plaintiffs. Although Plaintiffs had executed Employment Agreements, the promises by Speyer were that the employment compensation would be increased substantially as soon as the company's operations progressed.

29. The Plaintiffs, in addition to placing the ads, optimized the maximum revenue for the ads and did so by the talents of Pagoulatos, Rezitis, and Belani.

30. The aforesaid promised payment set forth in the Agreement attached hereto and made a part hereof as Exhibit C of Four Hundred Thousand ($400,000.00) Dollars as well as the payment of debt made by Defendants would have been generated by the business of Plaintiffs. The Defendants refused to pay Daily Media's debts when due, which caused great stress to Plaintiffs and the loss of Daily Media's good name in the industry. Plaintiffs have consistently have had to console various creditors and clients because of the lack of payment by the Defendants. The sole force putting the Plaintiffs with the Defendants in the within transaction was the promise to increase working capital and the growth of the business.

31. The Defendants precluded any such growth of the business by increasing the "cash flow problems" contrary to the very inducements to enter into the within Agreement.

32. Notwithstanding the lack of funding by the Defendants, Todd Speyer (hereinafter referred to as "Todd") the son of Speyer had a separate company, believed to be named Bright Mountain Acquisition Co. (hereinafter referred to as "TODDCO"), which is believed to be

a wholly owned subsidiary of the Defendant, Bright Mountain, which did direct advertising on the internet unlike the indirect advertising of the Plaintiffs.

33. Todd began using Daily Media's services in September of 2017 which further diminished Daily Media's ability to generate income and grow its business.

34. In addition, it was the very representations of the Defendants and the need for Daily Media that Daily Media's employment be increased. In or about March 2018, Plaintiffs requested additional employment for the purposes of the growth of the company and the Defendants failed and refused to accommodate the Plaintiffs.

35. As a consequence of the underemployment Daily Media has been unable to show any growth and has missed various, scheduled cash advances from the onset.

36. In or about April of 2018, Speyer directed Plaintiffs to increase the size of Belani's office. Defendants knew that Plaintiffs had a personal relationship with Belani and asked them to work with Belani to increase the size of his office.

37. Plaintiffs advanced the sum of Two Thousand Eight Hundred ($2,800.00) Dollars for the security deposit, which said security, although demanded of the Defendants, was never repaid to Plaintiffs.

38. It was further represented by Speyer that the Defendant Corporation would continue to fund the payment of Belani through the operations of Daily Media; however, it was specifically represented that the Defendants would increase the funding so that Belani could increase employment from seven (7) people to approximately twenty (20). Unfortunately, and as a consequence of the lack of funding by the Defendants, the workforce surrounding Belani remains at seven (7) and was never increased to twenty (20).

39. This drain of services was used to enhance TODDCO. On May 20, 2018, Todd directed

Belani to take on more responsibility as to the optimization of TODDCO's servers.

40. It was the quintessence of the Agreement that the Defendants had sufficient money to eliminate the "cash flow problems" experienced by the Plaintiffs.

41. As a consequence of Defendants' failure to provide the very consideration for the Agreement itself, Pagoulatos has been directed to renegotiate with customers to increase their time periods for payments due, which has caused large and divers issues and has further tarnished Daily Media's name in the industry.

42. There has been no significant growth whatsoever with respect to Daily Media's potential and, in fact, profit margins have decreased along with the reputation of Daily Media.

43. Payments to vendors have been made untimely causing further stress and creditability problems for Daily Media.

44. Notwithstanding the foregoing, the decrease in profitability and the tarnishing of Daily Media's name has totally destroyed the value that Plaintiffs might ever receive with respect to its stock ever having any value.

45. Recently, Plaintiffs had been contacted and, specifically Pagoulatos, with the often told concept that Defendants had insufficient money to fund the operations of Daily Media.

46. Pagoulatos has repeatedly stressed to Speyer the importance of Speyer's influx of money and the consequences of his failure to provide same. Just prior to the filing of the within Complaint Speyer contacted Pagoulatos and advised, contrary to subsequent emails, that he would not be in a position to honor the payment of the aforesaid Notes due September 19, 2018, and further advised Pagoulatos that because of same he would have to provide the Plaintiffs with preferred stock in lieu of cash.

47. As a result of the foregoing, Plaintiffs initiated actions to subsequently file the within

Complaint and to operate in such a way so as to mitigate the damages caused by Defendants and to somehow preserve the fruits of their labor.

48. The actions by the Defendants and the persons within their control so as to diminish the control of the Plaintiffs with respect to the operations of Daily Media and the lack of compensation to them has in effect constructively terminated their employment. There exists no consideration for the Agreement and the included Employment Agreements contained therein.


## COUNT I
## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS, BRIGHT MOUNTAIN AND SPEYER

49. Plaintiffs repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (48) of this Complaint, as if fully set forth herein.

50. Plaintiffs entreated into both written and oral Agreements with the Defendants.

51. Pursuant to the Agreements, Defendants owed certain duties and obligations to properly fund the operations of Daily Media so as to grow the company consistent with Defendants' representations, and to exercise same in good faith and fair dealing.

52. Defendants have failed to fulfill the aforesaid duties and obligations with respect to the Agreements. Specifically, Defendants have failed to fund the operations at the proper volume and pace so as to establish a meaningful profit margin, and have additionally failed to properly pay vendors so as to expand their customer base and grow the company.

53. Defendants additionally promised to make contributions for working capital contrary to the very lynchpin of the Agreements such that sales and profits are declining and ruining the name of Daily Media in the industry.

54. Further, TODDCO used the resources of Daily Media thereby increasing its costs, decreasing its profits and precluding its growth without necessary working capital. .

55. The failure of Defendants to properly fund the business of Plaintiffs, as well as make payments to Plaintiffs in compliance with the Agreements, is contrary to the covenant of good faith and fair dealing, and constitutes a breach of the Agreements.

56. Finally, Defendants' consistent underfunding, untimely payments to creditors, and the draining of resources have precluded "growing the business," contrary to Defendants previous representations to Plaintiffs.

57. Defendants have breached the very fabric of the Agreements.

58. The Defendants have acted unethically and in bad faith so as to constitute "unclean hands."

59. Defendants conduct and actions constitute a total failure of any consideration.

60. As a result of the aforesaid breaches, Plaintiffs have been damaged.

61. Due to the continuing pattern of bad faith and self-dealing on the part of the Defendants, Plaintiffs have had no choice but to terminate their relationship with Defendants and salvage whatever remains of Daily Media.

**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

A.  An accounting;

B.  Damages;

C.  Interest and costs of suit; and,

D.  Such other and further relief as the Court may deem equitable and just.

## COUNT II
## FRAUD IN THE INDUCEMENT AGAINST DEFENDANTS, BRIGHT MOUNTAIN AND SPEYER

62. Plaintiffs repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (61) of this Complaint, as if fully set forth herein.

63. Defendants knowingly and intentionally made false representations of material fact to Plaintiffs during the negotiations leading up to the execution of the Agreement, as well as during Defendants' performance under the Agreement.

64. Specifically, Defendants consistently represented to Plaintiffs that Defendants would ensure profitability by funding the "cash flow problems" so as to "grow the business," such that any capital stock given to Plaintiffs would have value, which said representations along with up-front cash payments were the very lynchpin of the Agreement.

65. Contrary to such representations, Defendants failed to produce the working capital necessary to "grow the business."

66. Further, Defendants promised Plaintiffs, the original sum of One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars plus stock in a public company worth Two Million Nine Hundred and Fifty Thousand ($2,950,000.00) Dollars, the cash of which was later reduced to Three Hundred and Eighty Thousand ($380,000.00) Dollars payable on September 19, 2018, a year after closing.

67. Defendant Speyer, just prior to Plaintiffs' filing of the within lawsuit, advised that even the reduced cash amount would not be paid due to a lack of funding.

68. Funding was the very consideration for the Agreement and the main inducement, therefore.

69. Plaintiffs have received no consideration while the Defendants attempt to use Plaintiffs' company to rescue the Defendant Corporation at the expense of Plaintiffs.

70. The Plaintiffs were induced into this Agreement which is the subject of the Complaint by the fraud and misrepresentations of the Defendants.

71. The Defendants promised money up front and the influx of money into Daily Media to grow the company and benefit the Plaintiffs. Plaintiffs have received nothing but broken promises.

72. Defendants made these false statements with knowledge of their falsity and Plaintiffs ignorance of same.

73. The Defendants understood that Plaintiffs relied upon the false statements.

74. The Plaintiffs had actual reliance upon these fraudulent representations.

75. The Defendants were and continue to be severely damaged as a result of the fraudulent scheme.

**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

    A.      An accounting;

    B.      Compensatory damages;

    C.      Punitive damages;

    D.      Interest and costs of suit; and,

    E.      Such other and further relief as the Court may deem equitable and just.


### COUNT III
### MINORITY SHAREHOLDER OPPRESSION IN VIOLATION OF THE REVISED UNIFORM LIMITED LIABILITY COMPANY ACT, N.J.S.A. 42:2C-1 *ET SEQ.*, AGAINST DEFENDANTS

76. Plaintiffs repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (75) of this Complaint, as if fully set forth herein.

77. Defendant Speyer, as the principal of Bright Mountain, engaged and continues to engage

in conduct that has frustrated the reasonable expectations of Plaintiffs as minority shareholders of Daily Media. Specifically, Speyer acted fraudulently, mismanaged Daily Media, abused his authority as officer and/or director, and has acted oppressively and unfairly toward Plaintiffs.

78. Plaintiffs agreed to a minority interest in Daily Media only in anticipation of money and the hope of enjoying an increase in the value of any ownership interest in Daily Media as a member.

79. By way of illustration and not of limitation, Defendants purchased Daily Media in an attempt to acquire same without investing working capital which was the very linchpin off the entire Agreement. Defendants acting pursuant to a fraudulent scheme to constructively terminate the Plaintiffs and retain Daily Media without ever paying any consideration therefore.

80. Defendant Speyer has caused a drain of Daily Media's resources to further better his own interests to the detriment of Daily Media and the Plaintiffs.

81. Defendants have failed to pay invoices due vendors of Daily Media causing a deterioration of Daily Media's reputation in the industry.

82. As a consequence of the foregoing, the reasonable expectations of Plaintiffs with respect to the benefits of ownership were frustrated, such that the majority shareholders breached their fiduciary duty to Plaintiffs. The conditions leading to the constructive termination of the employment of Plaintiffs were targeted to oppress Plaintiffs, and were malicious and devoid of sound business judgment.

83. By virtue of the foregoing, Defendants have acted abusively, oppressively, and unfairly toward Plaintiffs, in violation of N.J.S.A. 42:2C *et seq*.

**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

A.      An accounting;

B.      Dissolution of Daily Media;

C.      Compensatory damages;

D.      Punitive damages;

E.      Attorney's fees, pursuant to N.J.S.A. 42:2C *et seq*.

F.      Interest and costs of suit; and,

G.      Such other and further relief as the Court may deem equitable and just.


## COUNT IV
## COMMON LAW FRAUD AGAINST DEFENDANTS

84. Defendants repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (83) of this Complaint, as if fully set forth herein.

85. Defendants represented that they would, in effect, grow the business of the Plaintiffs, Daily Media, by the influx of substantial working capital so as to increase the numbers of customers and therefore provide Plaintiffs with a return on their original investment of time in establishing and creating Daily Media.

86. The Plaintiffs had been short of working capital and took Defendants at their promises to supply the necessary working capital to "grow their business."

87. Defendants chose the Agreement regarding the acquisition of investors through an offering so as to accommodate Plaintiffs' needs.

88. Plaintiffs were initially promised the total consideration of approximately Five Million ($5,000,000.00) Dollars. As things became tighter and tighter with respect to cash flow caused by delays in closing, the Defendants' use of this leverage created by the time delay

forced the Plaintiffs to execute a new Agreement providing them with cash in the sum of Three Hundred and Eighty Thousand ($380,000.00) Dollars in lieu of the original One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars. Additionally, this sum was not payable at closing but rather to be paid a year later on September 19, 2018.

89. Plaintiffs were to further achieve a return on their investment by the increase in value of certain restrictive stock as more fully set forth in the Agreement.

90. The Defendants failed and refused to supply the necessary capital so as to grow the business of Plaintiffs thereby breaching the very essence of the promises made by the Defendants. In fact, Plaintiffs have received nothing whatsoever other than a minimal salary similar to what they had received previously, which said salary had been reduced for the first four (4) months of the aforesaid Agreement.

91. Due to the failure to fund Daily Media, as well as the draining of resources by other entities owned by the Defendants, the expenses of Daily Media were increased, profits decreased and its reputation lost within the industry such that its future has been severely, if not irreparably, compromised.

92. As a consequence of Defendants willful depravation of Plaintiffs as to their right to the aforesaid promises of monies and the enhancement of ownership, the Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

A.      An accounting;

B.      Compensatory damages;

C.      Punitive damages;

    D.      Interest and costs of suit; and,

    E.      Such other and further relief as the Court may deem equitable and just.

## COUNT V
## EQUITABLE FRAUD PERMITTING RESCISSION

93. Defendants repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (92) of this Complaint, as if fully set forth herein.

94. Plaintiffs seek a rescission of the Agreement as the Agreement was made by the Defendants making false material representations of presently existing and/or past facts.

95. Defendant Speyer permitted Plaintiffs to execute a Contract knowing that Plaintiffs were under a misapprehension as to the terms of the Contract and more importantly the aforesaid fraudulent scheme as set forth herein.

96. It was Defendant's intent that those representations be relied upon.

97. Plaintiffs did so rely on Defendant's representation to their damage.

**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

    A.      An accounting;

    B.      Compensatory damages;

    C.      Punitive damages;

    D.      Interest and costs of suit; and,

    E.      Such other and further relief as the Court may deem equitable and just.

## COUNT VI
## FRAUDULENT CONCEALMENT

98. Defendants repeat, re-allege, and incorporate by reference the allegations set forth in Paragraphs (1) through (97) of this Complaint, as if fully set forth herein.

99. Defendants were in a fiduciary relationship with the Plaintiffs in that the Defendants owed to the Plaintiffs a fiduciary obligation of trust and confidence.

100. Within that fiduciary relationship, the Defendants intentionally concealed and failed to disclose the initial material fact that Defendants never intended to pay to Plaintiffs any up-front monies as reflected from the initial promises of One Million Nine Hundred and Fifty Thousand ($1,950,000.00) Dollars and the ultimate closing proceeds of $0.00, as well as representations of the value of any restricted stock being provided to Plaintiffs as being well below Plaintiffs' expectations with respect to the initial representations by Defendants.

101. The Plaintiffs relied on the wrongdoing of Defendants, to their detriment, and have been damaged.

102. The aforesaid damage was proximately caused by the fraudulent concealment.


**WHEREFORE**, Plaintiffs demand Judgment against the Defendants for:

    A.      An accounting;

    B.      Compensatory damages;

    C.      Punitive damages;

    D.      Interest and costs of suit; and,

    E.      Such other and further relief as the Court may deem equitable and just.

DATED: July 3, 2018

Respectfully submitted,

KRIDEL LAW GROUP

By: _____
James A. Kridel, Jr., Esq.
1035 Route 46 East
Suite B-204
Clifton, New Jersey 07013
(973) 470-0800 – Telephone
(973) 472-1902 – Facsimile
law@kridel.com – Email
*Attorneys for Plaintiffs, Harry G. Pagoulatos,*
*George G. Rezitis, and Angelos Triantafillou*

## DEMAND FOR JURY TRIAL

The Plaintiffs respectfully request a Jury Trial in accordance with Fed. R. Civ. P. 38(b).

James A. Kridel, Jr., Esq., is hereby designated as trial counsel for Plaintiffs in the within matter.

DATED: July 3, 2018

Respectfully submitted,

KRIDEL LAW GROUP

By: _____
James A. Kridel, Jr., Esq.
1035 Route 46 East
Suite B-204
Clifton, New Jersey 07013
(973) 470-0800 – Telephone
(973) 472-1902 – Facsimile
law@kridel.com – Email
*Attorneys for Plaintiffs, Harry G. Pagoulatos,*
*George G. Rezitis, and Angelos Triantafillou*

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 201.1(d)(3)**

Pursuant to Local Civil Rules 11.2 and 201.1(d)(3), it is hereby certified (i) that the matter in controversy is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding, and (ii) that the matter in controversy is not subject to compulsory arbitration because the amount of damages recoverable exceeds $150,000.00, exclusive of interest and costs and any claim for punitive damages.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: July 3, 2018

Respectfully submitted,

KRIDEL LAW GROUP

By: _____

James A. Kridel, Jr., Esq.
1035 Route 46 East
Suite B-204
Clifton, New Jersey 07013
(973) 470-0800 – Telephone
(973) 472-1902 – Facsimile
law@kridel.com – Email
*Attorneys for Plaintiffs, Harry G. Pagoulatos,
George G. Rezitis, and Angelos Triantafillou*